THE STATE OF OHIO, APPELLEE, v. VRABEL, APPELLANT.

[Cite as *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193.]

(No. 2000–0644—Submitted February 25, 2003—Decided July 2, 2003.)

ALICE ROBIE RESNICK, J.

{¶ 1} On April 10, 1989, appellant, Stephen Vrabel, was indicted by a grand jury on two counts of aggravated murder in the deaths of Susan and Lisa Clemente, each carrying a death-penalty specification alleging that the murders were committed as a course of conduct involving the killing or attempt to kill two or more persons.

### I. Facts and Case History

{¶ 2} Appellant and Susan Clemente lived together in an apartment they rented from Susan's sister and brother-in-law in Struthers, Ohio. Although appellant and Susan were not married, they had a child, Lisa, who was born in 1985.

{¶ 3} On March 3, 1989, appellant went into the Miller Rod and Gun Store in Youngstown, Ohio, to purchase a gun. He selected a gun; however, when

appellant produced his driver's license for identification, he was told he could not make the purchase because his license had expired. Later that afternoon, appellant returned to the gun shop with a valid Ohio ID card. He then purchased a Jennings .22 semiautomatic handgun and ammunition; at that time, there was no waiting period to purchase it. During his visit to the gun shop, appellant appeared to be calm and did not seem nervous, anxious, or intoxicated.

{¶ 4} Appellant later told police that he had bought the gun for no particular reason except that he had always wanted one. When he returned to the apartment, he loaded the gun and put it in the hallway closet. He then began drinking beer heavily and smoking marijuana. Appellant maintained that on the day of the murders, there was no confrontation between him and Susan. Nevertheless, appellant retrieved the loaded gun and pointed it at Susan as she was walking to the kitchen. He fired one shot at Susan's head, and she fell face down, moaning. Lisa began "freaking out." Appellant then thought to himself that he did not want Susan to suffer, so he shot her in the head again as she lay on the kitchen floor. While trying to calm Lisa, appellant surmised that since Lisa's mother was dead and her father would now go to prison, Lisa would be better off dead. He fired one shot at Lisa's head and "felt that she died immediately."

{¶ 5} Appellant then left the apartment with the gun and checked into a motel in Liberty Township, where he spent the night. The next morning, he drove Susan's 1976 Plymouth to Wheeling, West Virginia, and left it there. He then took a Greyhound bus to Columbus and spent the night at a hotel near the Ohio State University campus. The following morning, appellant took a bus back to Wheeling, picked up Susan's car, and drove back to his apartment in Struthers. Appellant poured floor stripper over the bodies because they smelled and slept in the apartment that night.

{¶ 6} The next day, appellant wrapped the bodies in blankets and sheets. He emptied the refrigerator and put Susan's body in the refrigerator and Lisa's body in the freezer compartment. He also put two of Lisa's favorite stuffed animals in the freezer with her. Appellant then tried to clean the blood off the floor with several household cleaning agents. He cut out a bloodstained portion of the hallway carpet and disposed of it in the apartment dumpster.

{¶ 7} During the rest of March 1989, appellant continued to live in the Struthers apartment. Susan's sister, Linda Aey, attempted to visit Susan at the apartment several times in order to collect the March rent. On one occasion, appellant opened the back window and told Linda that Susan and Lisa were not feeling well. Another time, appellant told her that Susan and Lisa were at the grocery store. On each occasion, appellant seemed "fine" to Linda.

{¶ 8} On April 4, 1989, appellant again checked into a motel in Liberty Township. The following night, he stayed at a motel in Austintown. Meanwhile, Linda's Aey's husband, Michael Aey, went to appellant's apartment in the early evening of April 5 to collect two months' rent. As he went up the apartment stairs, he noticed a smell of cleaning fluids. When he entered the apartment, he saw that it was "messed up." Before he left, he opened the refrigerator and discovered Susan's body. Aey went home and then to the police, since there was no telephone in the apartment.

{¶ 9} Upon arriving at appellant's apartment, police found it to be "a mess," with beer cans in every room. During their investigation at the scene, police found Lisa's body in the freezer compartment wrapped in a blanket along with a pillow that was later found to have gunshot residue on it. Police also found three shell casings in plain view. The deputy coroner later determined that both Susan and Lisa had died of gunshot wounds to the head.

{¶ 10} On the morning of April 6, 1989, appellant was driving Susan's car to Parma when he heard on the radio that the bodies of Susan and Lisa had been discovered and that police were looking for the victim's boyfriend. He then went to St. Charles Catholic Church in Parma and approached the pastor, Father John T. Carlin. Appellant told Father Carlin that he had been involved in the homicides of his wife and child. Appellant asked Father Carlin to accompany him to the Parma police station.

{¶ 11} Parma police informed Struthers police that they had appellant in custody. The Parma police advised him of his *Miranda* rights, which he waived. Appellant gave an oral statement that was then reduced to writing. He admitted shooting Susan and Lisa but claimed he did not know why he had shot Susan. He stated that the gun used in the shootings was in a gray duffel bag in the back seat of the Plymouth that he had parked outside the station. Police obtained a search warrant and found the gun where appellant said it would be.

{¶ 12} Struthers police also advised appellant of his *Miranda* rights, which he again waived, before giving a statement. When asked what caused the incident, appellant responded, "Sometimes when I drink, things happen." He then admitted committing the murders and described to police the events surrounding the murders and his actions during the month leading up to his surrender and arrest in Parma.

{¶ 13} Ballistics testing and comparisons made on the cartridge casings found in appellant's apartment, as well as the bullet fragments recovered in the autopsy of Susan Clemente, were consistent with the characteristics found on the bullets test-fired from the murder weapon belonging to appellant.

{¶ 14} On April 10, 1989, the grand jury indicted appellant on two counts of aggravated murder, each carrying a death-penalty specification alleging that the

murders were committed as a course of conduct involving the killing or attempt to kill two or more persons pursuant to R.C. 2929.04(A)(5). Each count also carried a firearm specification.

{¶ 15} Former R.C. 2945.37(A) provided:

{¶ 16} "A defendant is presumed competent to stand trial unless it is proved by a preponderance of the evidence in a hearing under this section that because of his present mental condition he is incapable of understanding the nature and objective of the proceedings against him or of presently assisting in his defense." Am.Sub.H.B. No. 565, 137 Ohio Laws, Part II, 2937, 2943.

{¶ 17} Following appellant's indictment for aggravated murder in 1989, the trial court appointed mental health professionals to evaluate him, and psychologist Nancy Huntsman found appellant incompetent to stand trial. Appellant was committed to the Timothy B. Moritz Forensic Center in 1990 and remained there until 1994. On August 30, 1994, the Western Reserve Psychiatric Hospital notified the Mahoning County Prosecutor in a psychiatric report that appellant was then competent to stand trial and had no active mental illness.

{¶ 18} Following his reindictment, both the state and defense agreed to have Dr. Otto Kausch examine appellant to evaluate his competency to stand trial. At a November 3, 1994 competency hearing, Dr. Kausch, a psychiatrist at Western Reserve Psychiatric Hospital, testified that, based upon a reasonable medical and psychiatric certainty, appellant possessed the capacity and willingness to assist in his own defense. Dr. Kausch further observed that appellant has personality problems that may, under stress, cause him to act in ways that could be potentially disruptive to the trial proceedings. Dr. Kausch noted that while appellant was in the hospital, Dr. Phillip Resnick, a professor of psychiatry at Case Western Reserve University, and others examined him as well. Taking into consideration all of the evaluations performed up to that time, Dr. Kausch concluded that appellant was malingering and that he was not mentally ill. At the conclusion of the hearing, the court held appellant competent to stand trial and ordered a mental exam pursuant to his plea of not guilty by reason of insanity.

{¶ 19} At a February 7, 1995 hearing on competency, both sides stipulated to the reports of Dr. Giannini and the Forensic Psychiatric Center of Northeast Ohio. The court again declared appellant competent to stand trial. At that time, appellant also moved to withdraw his insanity plea.

{¶ 20} At a hearing on March 21, 1995, upon defendant's advisory counsel's motion, the court ordered appellant's competency to stand trial reevaluated. At a March 24, 1995 hearing, the court admitted the report of Dr. Brian Sullivan, who concluded that appellant was competent to stand trial. Dr. Sullivan specifically found that appellant "is able to understand the charges against him and partici-

pate meaningfully in his defense." Also at that hearing, appellant acknowledged that his motion to change venue to the spirit world was "meant as a joke."

{¶ 21} Subsequently, he entered another plea of not guilty by reason of insanity. Difficulties arose because of appellant's refusal to cooperate with mental health professionals who were appointed to evaluate his state of mind at the time of the crimes. Eventually, appellant cooperated with two professionals. In a report dated August 24, 1995, Dr. Giannini stated that appellant "is capable of participating meaningfully in his own defense." In a report dated August 29, 1995, Douglas Darnall, Ph.D., concluded that appellant "did not know the wrongfulness of his act" at the time of the murders, but "he is capable of working with his attorney and aiding in his defense, thought [sic] his cooperation will be erratic." On September 12, 1995, trial began with the voir dire of prospective jurors. At trial, the state called numerous witnesses, and the defense presented several of its own in support of appellant's insanity defense. Dr. Douglas Darnall, a clinical psychologist called on behalf of the defense, testified that appellant "did not have the ability to conform to the confines of law [and] could not distinguish between right and wrong." In rebuttal, the state presented Dr. James Giannini, who opined that appellant "was sane at the time of the commission of the two acts for which he is being charged. * * * [H]e did know the difference between right and wrong." After deliberation, the jury found appellant guilty as charged.

{¶ 22} During the mitigation phase, appellant elected to present only his unsworn statement as evidence. During his unsworn statement, he said, "[B]asically what I am saying is there is nothing of a mitigatory factor that can outweigh the aggravating circumstances that occurred that most notably of two people's lives being wiped out."

{¶ 23} The trial court instructed the jury on three mitigating factors: R.C. 2929.04(B)(3)—mental disease or defect, (B)(5)—lack of a significant history of criminal convictions, and (B)(7)—any other factors relevant to the issue of whether defendant should be sentenced to death. Appellant was found guilty by a jury and sentenced to death. The Court of Appeals for Mahoning County affirmed the conviction and sentence of death. Appellant appeals the judgment to this court as a matter of right.

{¶ 24} Appellant has raised 13 propositions of law. We have reviewed each and have determined that none justifies reversal of appellant's convictions. We have also independently weighed the aggravating circumstances against the mitigating factors and have reviewed the death penalty for appropriateness and proportionality pursuant to R.C. 2929.05(A). For the following reasons, we affirm appellant's convictions and death sentence.

## II. Competency Issues

### A. Defendant's Competency

{¶ 25} In his first proposition of law, appellant asserts that the trial court ignored objective lay evidence of his incompetence to stand trial and ruled him competent based solely on psychiatric and psychological testimony. He further asserts that he was incompetent to stand trial because his paranoia did not permit him to trust his lawyers. Appellant relies on *Lagway v. Dallman* (N.D.Ohio 1992), 806 F.Supp. 1322, 1341, for the proposition that a court may disregard or discount expert testimony in a competency hearing if there are objective reasons for doing so.

{¶ 26} Appellant contends that there are many reasons for the trial court to have disregarded or discounted the expert reports finding him competent to stand trial. First, he claims that only one of the reports relied on by the court delved into whether appellant was able to freely exercise his constitutional rights or whether his desire to waive counsel was compelled by his paranoid personality. Second, he says, none of the experts indicated in their reports that they had consulted with defense counsel about their ability to confer and to work with appellant for the benefit of his own defense.

{¶ 27} Appellant also cites "objective reasons" found in documents and other matters that he asserts compelled the trial court to find him incompetent, namely: (1) at his initial appearance after reindictment, appellant stated, "As character witnesses I need to go to Korea where many women will testify I never laid a hand on them"; (2) appellant filed a motion "for a change of venue—preferably to the 'SPIRIT WORLD' or if not permitted—North Korea, Vietnam, or any anti-American Islamic nation"; and (3) appellant listed the "Queen of Hearts" on a list of prospective witnesses that he prepared pro se.

{¶ 28} Appellant also argues that counsel were ineffective for failing to fully present evidence of his incompetence. However, we find that his arguments lack merit.

{¶ 29} A number of mental health examiners in the months leading up to his trial found appellant competent to stand trial. The fact that he continually behaved erratically does not undermine the trial court's findings of his competence to stand trial. Dr. Kausch specifically noted that appellant's potential for disruption did not negate these findings. Nor does this outburst from appellant during voir dire suggest incompetence: "He told me to act crazy. He wants me to act crazy." As this court noted in *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016, "Incompetency must not be equated with mere mental or emotional instability or even with outright insanity. A defendant may

be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel."

{¶ 30} Nor is the fact that appellant was uncooperative with defense counsel at various times an indicator that he lacked competence to stand trial. As we noted in *State v. Berry* (1995), 72 Ohio St.3d 354, 360–361, 650 N.E.2d 433, lack of cooperation with counsel does not constitute sufficient indicia of incompetence to raise doubt about a defendant's competence to stand trial.

{¶ 31} Moreover, as will be explored under appellant's second proposition of law, the trial court also found him competent to waive presentation of mitigation evidence at the end of the trial phase based upon a competency evaluation performed by Dr. Robert Algaier.

{¶ 32} Given the fact that at least six mental health professionals examined appellant subsequent to his reindictment in 1994 and all of them found him competent to stand trial, the trial court acted properly in relying on these evaluations.

{¶ 33} We find that the trial court did not abuse its discretion in finding appellant competent. Under these circumstances, we will not disturb the trial court's findings, since there was some reliable, credible evidence supporting them. *State v. Williams* (1986), 23 Ohio St.3d 16, 19, 23 OBR 13, 490 N.E.2d 906; *State v. Hicks* (1989), 43 Ohio St.3d 72, 79, 538 N.E.2d 1030. Deference on these issues should be given to those "who see and hear what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298.

{¶ 34} Nor does it appear that defense counsel were ineffective in failing to present "all evidence of incompetence" before the trial court. As we noted above, counsel continually urged the trial court to have appellant's competency evaluated. In light of the numerous professional evaluations requested by defense counsel, there is nothing to suggest that counsel's performance was deficient or prejudiced appellant's right to a fair trial or fair competency hearings. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accordingly, we reject appellant's first proposition of law.

## B. Defendant's Waiver of Mitigation

{¶ 35} In his second proposition of law, appellant contends that since defendant's competence was called into question, his request not to present mitigating evidence should have been denied. He asserts that by acceding to his decision, the court in effect relegated appellant to self-representation during the mitigation phase. Appellant further asserts that the trial court abused its discretion in permitting defendant to proceed in such a manner.

{¶ 36} At the close of the trial phase, after the jury returned its verdict of guilty on all charges, the court convened the parties in chambers. At that time, appellant filed an ex parte motion with the court requesting that defense counsel and the court present no witnesses on his behalf at the mitigation hearing other than appellant himself. He cited *State v. Tyler* (1990), 50 Ohio St.3d 24, 28, 553 N.E.2d 576, in support of his request. The trial judge reminded appellant about the consequences he would likely face if he offered no mitigating evidence. The court then ordered him examined by psychiatrist Dr. Robert Algaier to determine whether he was competent to waive presentation of mitigation evidence.

{¶ 37} The following day, Dr. Algaier examined appellant. In his report, Dr. Algaier found him capable of "waiving mitigation with full understanding of possible outcome and implications." Prior to the mitigation hearing, the trial court tried several times to persuade appellant to change his mind; he declared, "I don't wish my attorneys to say anything." Subsequently, appellant presented only a short unsworn statement at the mitigation hearing.

{¶ 38} In our view, the trial court did not abuse its discretion in relying on Dr. Algaier's report, which found appellant competent to waive the presentation of mitigation evidence. In *Tyler*, 50 Ohio St.3d at 29, 553 N.E.2d 576, we found that a desire to waive mitigation evidence does not by itself require a competency hearing. Yet in this case, based on appellant's prior mental history, a competency evaluation was ordered for him, which concluded he was competent to waive the presentation of mitigating evidence.

{¶ 39} As we noted in *State v. Ashworth* (1999), 85 Ohio St.3d 56, 63, 706 N.E.2d 1231, even if a trial court attempts to require an attorney to present mitigating evidence, it cannot force an unwilling defendant to provide that evidence to his attorney. Moreover, where the defendant does not want to present mitigating evidence, no societal interest counterbalances the defendant's right to control his own defense. *Tyler*, 50 Ohio St.3d at 28, 553 N.E.2d 576.

{¶ 40} Here, after receiving Dr. Algaier's evaluation of appellant, the trial court conducted an inquiry to ensure that his waiver of presentation of mitigation evidence was knowing and voluntary, as required in *Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus. Thus, the record supports the court of appeals' finding that the trial court did not err in permitting appellant's waiver of mitigating evidence. *State v. Cowans* (1999), 87 Ohio St.3d 68, 85–86, 717 N.E.2d 298. Therefore, appellant's second proposition of law is overruled.

### III. Pretrial/Voir Dire Issues

#### A. Right of Self–Representation

{¶ 41} In his third proposition of law, appellant offers an alternative argument to his first two propositions of law. He argues that because the trial court

determined him competent to stand trial, the trial court erred in refusing to allow him to represent himself, as he requested. See *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562.

{¶ 42} After his reindictment, appellant indicated that he wanted to represent himself, and the trial court accepted his waiver of counsel. Trial was set for March 29. Then, at a March 21, 1995 hearing, advisory counsel informed the court that appellant wanted them to assume his representation. Appellant contradicted them, stating that he still wanted to represent himself. Subsequently, at a March 24, 1995 suppression hearing, appellant stated at least twice that he wished to proceed as his own counsel.

{¶ 43} After the March 24, 1995 hearing, on the date set for trial to begin, appellant informed the court that he wanted counsel to represent him. There is no docket item in the record reflecting this change of mind, but the transcript from a May 12, 1995 hearing indicates that it took place. Also at the May 12 hearing, it was discovered that appellant indicated in a letter, dated April 26, 1995, that he wished to terminate counsel and represent himself again. The court characterized appellant's numerous changes of mind on this matter as an abuse of the right to represent himself, and denied his motion to terminate counsel. However, the court further noted, "The Defendant, if he wishes to proceed as his own counsel, can act as such independently of [defense counsel], and on September the 11th one way or another we are going forward [with trial]." Consequently, counsel continued to represent appellant.

{¶ 44} At an August 1, 1995 suppression hearing, at which counsel represented appellant, the court again advised him that he had the right to represent himself and that trial would begin as scheduled in September, whether or not he chose to represent himself. Counsel continued to represent appellant and voir dire began on September 12, 1995.

{¶ 45} On September 14, 1995, appellant again requested to be his "own attorney if the Court will allow that considering all that has happened." The trial judge told appellant, "I'm not going to allow you to ping-pong back and forth; you represent yourself, they are representing you * * *." The judge reiterated appellant's constitutional right to represent himself and asked him to discuss the matter with counsel and decide whether he wanted to proceed pro se before voir dire continued any further.

{¶ 46} Appellant indicated that he would discuss the matter of self-representation later rather than delay trial, and he allowed defense counsel to continue voir dire. Defense counsel told the court that they would discuss the matter of self-representation with appellant at a break in the proceedings. However, appellant never brought the matter up again until after voir dire was completed on

September 21, 1995. Counsel continued to represent appellant throughout voir dire.

{¶ 47} On September 25, 1995, the day trial began, appellant told the court that he wanted to represent himself. He acknowledged that he had told the court the previous Friday that he wanted defense counsel to represent him, but added, "[A]fter that discussion I looked at some more records* * *." Appellant declined to discuss why he had changed his mind. The trial judge engaged in a lengthy discussion with him and counsel for both parties in an attempt to dissuade appellant from his desire to proceed pro se. Counsel and the trial judge expressed the view that it was too late for appellant to reinvoke his right to self-representation, since the "trial has commenced, and, in fact, has been in session for some two weeks at this point." Nonetheless, appellant continued to assert that he wanted to represent himself, and the court continued to counsel him against such a decision.

{¶ 48} The following day, the court held that while appellant had the right to represent himself under *Faretta*, that right was not absolute. The court characterized his position as "a 13th hour change of heart by the Defendant." After reviewing the matter at length with the parties, the court ruled, "[I]t is my duty to deny the Defendant's request to represent himself * * *."

{¶ 49} We have held that if a trial court denies the right of self-representation when properly invoked, the denial is per se reversible error. *State v. Reed* (1996), 74 Ohio St.3d 534, 535, 660 N.E.2d 456, citing *McKaskle v. Wiggins* (1984), 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122. In our view, however, the right of self-representation here was not properly invoked.

{¶ 50} In the recent case of *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 37, we reasoned that the defendant's request to represent himself was untimely, since it was made only three days before the trial was to begin. Other courts, as noted in *Cassano*, have also found that invocation of the right of self-representation can be disallowed where such a request is untimely. See, e.g., *United States v. Mackovich* (C.A.10, 2000), 209 F.3d 1227, 1237 (requests made within ten days before trial "were merely a tactic for delay"); *United States v. George* (C.A.9, 1995), 56 F.3d 1078, 1084 (request made on eve of trial untimely); *Parton v. Wyrick* (C.A.8, 1983), 704 F.2d 415, 417 (request made morning of trial untimely); *United States v. Frazier–El* (C.A.4, 2000), 204 F.3d 553, 560 (the "right does not exist * * * to be used as a tactic for delay"). See, also, *State v. Randleman* (Aug. 20, 1982), Lucas App. L–82–078, 1982 WL 6549.

{¶ 51} Similarly, the Sixth Circuit upheld the Kentucky Supreme Court's denial of a defendant's motion for self-representation as untimely where the motion was made on the day of trial after the clerk had called the roll of jurors. *Robards v. Rees* (C.A.6, 1986), 789 F.2d 379, 384. More recently, the Minnesota Supreme

Court held that a trial begins at the commencement of voir dire and that the trial court has discretion about whether to grant a motion for self-representation at that point in the trial. *State v. Christian* (Minn.2003), 657 N.W.2d 186, 193.

{¶ 52} In the case at bar, appellant repeatedly changed his mind as to whether he wanted to represent himself or have counsel represent him prior to trial. The trial judge went to great lengths to accommodate appellant's continual changes of mind, and it is clear that the judge avoided acting hastily to ensure a correct and just decision. The trial court had previously allowed appellant the opportunity to represent himself under *Faretta* and *State v. Gibson* (1976), 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, until he invoked his right to counsel on the day his trial was originally scheduled to begin.

{¶ 53} Based on our reasoning in *Cassano* and the other cases cited above we hold that the trial court did not abuse its discretion and properly refused appellant's request to represent himself after voir dire had been completed and on the first day that evidence was to be presented. Extensive voir dire had already been completed, and appellant never completely invoked his right to proceed pro se. Under these circumstances, appellant's request to represent himself on the day the state would present evidence was untimely. Therefore, appellant's third proposition of law is rejected.

### B. Ineffective Assistance

{¶ 54} In his fourth proposition of law, appellant contends that his counsel were ineffective in failing to challenge jurors "who were obviously biased" and again asserts counsel's ineffectiveness in presenting evidence of his incompetence to stand trial. He further claims that counsel were ineffective for not challenging the R.C. 2929.04(A)(5) death specification as unconstitutionally overbroad.

{¶ 55} In order to prevail on a claim of ineffective assistance of counsel, a "defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense * * * so * * * as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 56} With regard to the claim of biased jurors, appellant asserts that jurors Chambers, Craciun, Pusch, and Powers should have been questioned more thoroughly and challenged for cause, based on opinions they expressed indicating bias against appellant. However, our previous review of the voir dire does not support his claims. Therefore, we find that counsel were not ineffective for failing to challenge each of them for cause.

{¶ 57} While juror Chambers indicated a "[s]trong possibility" that she would find appellant guilty if he did not present any evidence on his own behalf, she said

she would put that thinking aside, since the law requires a "different way" of thinking. She further asserted she could view appellant as innocent and would keep an "open mind" during the sentencing phase because, she said, "I don't take someone's life lightly." In addition, she would keep an open mind with respect to all evidence on insanity, even though one of the victims was a three-and-one-half year-old child.

{¶ 58} Trial courts have discretion in determining a juror's ability to be impartial. *State v. Williams* (1983) 6 Ohio St.3d 281, 288, 6 OBR 345, 452 N.E.2d 1323. The trial court here was satisfied that Chambers would be an impartial juror, and her voir dire testimony supports that conclusion. R.C. 2945.25(B). Thus, we find it highly unlikely that a challenge for cause would have been granted even if counsel had asserted it.

{¶ 59} Next, appellant claims counsel were ineffective for not challenging juror Craciun when he stated that "maybe" he would feel more strongly about imposing the death penalty because one of the victims was a young child. Upon further questioning, however, Craciun agreed that he could put the age of the victim aside and would not feel obligated to return a death verdict. Moreover, he stated, "you can't hold somebody responsible * * * if they lost it. I mean, you can't hold them responsible." In our view, Craciun's answers exhibited his ability to be fair and impartial.

{¶ 60} Appellant also asserts ineffective assistance of counsel based on the fact that juror Pusch was not questioned by defense counsel as to whether he would prefer death as a sentence if appellant were found guilty. Yet Pusch indicated he would consider life sentences, and added that a death verdict "depends on the circumstances of why that crime took place." Pusch's answers to questions indicated he would not be an "automatic" death-penalty juror under *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, and *State v. Williams* (1997), 79 Ohio St.3d 1, 6, 679 N.E.2d 646. Counsel's failure to ask Pusch whether he would prefer to impose death upon a guilty verdict did not constitute ineffective assistance.

{¶ 61} Likewise, counsel were not ineffective for failing to challenge juror Powers, who indicated he did not think "too well" of appellant when he heard of the murders. Appellant contends that Powers viewed the insanity defense with skepticism. However, Powers asserted that he would listen to defense evidence on insanity and stated that he could not punish a person unable to conform to law or who did not know the wrongfulness of his actions. In addition, Powers stated he would find appellant "not guilty" if he had to decide today, saying, "I do not have any solid evidence." Powers indicated he would set aside any opinions he had, including his opinion that psychology is "garbage sometimes."

{¶ 62} Appellant further claims counsel were ineffective for failing to raise "sufficient evidence" of defendant's incompetence before trial. Yet as we discussed under the first proposition of law, counsel repeatedly raised the issue of appellant's competence to stand trial, and the court ordered evaluation of his competency by mental health professionals on numerous occasions. Thus, appellant's claims of ineffectiveness are not supported in the record.

{¶ 63} Appellant next asserts that Ohio law requiring defense counsel to participate in death-qualifying a jury tells the jury that the defense has no confidence in the facts, thus undermining the defendant's constitutional presumption of innocence. We have, however, consistently rejected such arguments and have long held that death-qualifying a jury "does not deny a capital defendant a trial by an impartial jury." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph two of the syllabus; see, also, *State v. Dunlap* (1995), 73 Ohio St.3d 308, 315, 652 N.E.2d 988.

{¶ 64} Lastly, appellant argues counsel were ineffective for not challenging the course-of-conduct specification, R.C. 2929.04(A)(5), as overbroad. However, generalized overbreadth challenges are recognized only in First Amendment issues, which are absent here. *New York v. Ferber* (1982), 458 U.S. 747, 768, 102 S.Ct. 3348, 73 L.Ed.2d 1113; *State v. Brooks* (1996), 75 Ohio St.3d 148, 155, 661 N.E.2d 1030. Moreover, we previously examined the language of the course-of-conduct specification and upheld its constitutionality: "The language of the statute is definitive and is circumscribed to cover only those situations which it fairly describes." *State v. Benner* (1988), 40 Ohio St.3d 301, 305, 533 N.E.2d 701. Thus, counsel were not ineffective for failing to request that the trial court strike the specification on this ground.

{¶ 65} Based on the foregoing, appellant's fourth proposition of law is rejected.

## C.  Peremptory Challenges

{¶ 66} In his tenth proposition of law, appellant contends he was denied a fair trial when the court overruled his motion for 24 peremptory challenges. Appellant notes that R.C. 2945.21(A)(2) authorizes 12 peremptory challenges, and therefore he has a substantive right to that number. Crim.R. 24(C) authorizes six peremptory challenges in a capital case.

{¶ 67} Appellant's interpretation of the law is incorrect. In *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382, paragraph two of the syllabus, we specifically recognized: "The right to peremptorily challenge jurors during voir dire is a substantive right. The numerical limitation [of six peremptory challenges] imposed by Crim.R. 24(C) upon the exercise of such right reasonably regulates it." Consequently, appellant's tenth proposition of law is not well taken.

## IV. Trial Issues

### A. Gruesome Photographs

{¶ 68} In his eleventh proposition of law, appellant argues that he was denied a fair trial based on the admission of gruesome and cumulative photographs during both phases of trial.

{¶ 69} Under Evid.R. 403 and 611(A), the admission of photographs is left to a trial court's sound discretion. *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559 N.E.2d 710; *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 473 N.E.2d 768. Nonrepetitive photographs in a capital case, even if gruesome, are admissible if their probative value outweighs the danger of material prejudice to the accused. Id., paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267.

{¶ 70} Nevertheless, appellant complains that the defense never denied that he had committed the murders, nor did it insinuate that someone else had committed the crimes. Thus, he asserts that the probative value of the gruesome photos was minimal. We rejected similar arguments in *Maurer*, 15 Ohio St.3d at 264–265, 15 OBR 379, 473 N.E.2d 768, and *State v. Campbell* (2000), 90 Ohio St.3d 320, 345–346, 738 N.E.2d 1178. Appellant also contends that all the photos admitted were repetitive and cumulative in nature.

{¶ 71} In reviewing the 12 photographs that were gruesome and that were objected to by appellant, we note that only six were admitted into evidence: State Exhibits 3 and 4 are autopsy photos depicting the entrance and exit wounds of Lisa Clemente; State Exhibit 5 is an autopsy photo of Susan Clemente and shows a gunshot wound to her head; State Exhibit 9 depicts the victims' bodies as they were found in the apartment refrigerator and freezer. State Exhibit 14 shows the pillow found in the freezer compartment as it was removed at the crime scene; and State Exhibit 15 depicts the bundle with bindings of rope containing Lisa's body after it was removed from the freezer compartment. The trial court disallowed State Exhibits 6, 10, 11, 12, 13, and 16 as either repetitive of the aforementioned photos or prejudicial.

{¶ 72} All of the allegedly gruesome photos that were admitted into evidence illustrated the coroner's testimony describing the fatal gunshot wounds and helped to prove the killer's intent as well as the lack of accident or mistake. These photos also gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042. None of the admitted photos appear to be more prejudicial than probative. Therefore, the trial court did not abuse its discretion in admitting them.

{¶ 73} Additionally, the trial court did not err in readmitting the photos during the mitigation phase. A trial court may properly allow repetition of much or all

that occurred in the guilt phase pursuant to R.C. 2929.03(D)(1). *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542; *State v. Woodard* (1993), 68 Ohio St.3d 70, 81, 623 N.E.2d 75. Given the trial court's careful consideration of the photos during the trial phase, appellant's claims of prejudice are not persuasive. Accordingly, we overrule appellant's eleventh proposition of law.

## V. Constitutionality

{¶ 74} In his fifth, sixth, seventh, eighth, ninth, twelfth, and thirteenth propositions of law, appellant contends that Ohio's death-penalty scheme is unconstitutional on numerous grounds; however, we summarily reject his arguments, since they have been addressed in previous cases. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Davis* (1991), 62 Ohio St.3d 326, 351, 581 N.E.2d 1362; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50; *Jenkins*, 15 Ohio St.3d at 179, 15 OBR 311, 473 N.E.2d 264; *State v. Benner*, 40 Ohio St.3d at 305, 533 N.E.2d 701; *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113; *Brooks*, 75 Ohio St.3d at 155, 661 N.E.2d 1030.

## VI. Independent Review and Proportionality

{¶ 75} This case presents a situation in which appellant refused to present any mitigating evidence before the jury except his unsworn statement. As discussed under the second proposition of law, the trial court did not err in honoring appellant's decision to waive the presentation of mitigating evidence.

{¶ 76} In his unsworn statement, appellant stated, "And the only mitigating factor that I feel needs addressed, the evidence at the trial produced no evidence of a mental defect shortly prior to this. * * * And basically what I am saying is there is nothing of a mitigatory factor that can outweigh the aggravating circumstances that occurred that most notably of two people's lives being wiped out."

{¶ 77} Notwithstanding the fact that appellant presented *no* mitigating evidence, R.C. 2929.05(A) mandates that we "shall review and independently weigh *all of the facts and other evidence disclosed in the record in the case* and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case * * *." (Emphasis added.) Upon independent assessment, the evidence proves beyond a reasonable doubt the aggravating circumstance in this case: that Vrabel murdered Susan, his live-in companion, and Lisa Clemente, his daughter, as a course of conduct in killing two or more persons. R.C. 2929.04(A)(5).

{¶ 78} Furthermore, the nature and circumstances of the offense offer little in mitigation. Appellant bought a gun and shot both Susan and Lisa for no apparent reason after drinking beer and smoking marijuana. He wandered around Ohio and West Virginia in the days following the murders, then returned

to the scene of the crimes. He poured floor stripper over the bodies to mask their smell and then placed both victims into the apartment refrigerator. He next used various cleaning agents to clean up the blood on the kitchen floor and apartment rug.

{¶ 79} While we acknowledge that appellant's character and background offer some factors in mitigation—he attended classes at Youngstown State and performed above-average course work, he was evaluated by various mental health professionals as suffering from paranoid schizophrenia or a personality disorder with schizophrenic features, and he had no significant prior criminal history—the aggravating circumstances of appellant's crimes far outweigh and exceed those factors. Not only was appellant deliberate in causing the death of Susan Clemente, but he also rationalized the murder of their three-and-one-half-year-old daughter, Lisa Clemente, asserting that she would be "better off dead" since appellant had killed her mother and he would be going to jail.

{¶ 80} Moreover, Dr. Giannini, to a reasonable degree of medical certainty, rebutted the conclusion that appellant was not able to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. In performing our independent weighing, we determined that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. The death penalty is both appropriate and proportionate when compared with capital cases with a course of conduct involving the purposeful killing or attempted killing of two or more persons. See, e.g., State v. Davie, (1997), 80 Ohio St.3d 311, 686 N.E.2d 245; State v. Lundgren (1995), 73 Ohio St.3d 474, 653 N.E.2d 304; and State v. Sowell (1988), 39 Ohio St.3d 322, 530 N.E.2d 1294.

{¶ 81} For the foregoing reasons, we affirm appellant's convictions and death sentence.

Judgment affirmed.

F.E. SWEENEY, COONEY and O'CONNOR, JJ., concur.

MOYER, C.J., PFEIFER and LUNDBERG STRATTON, JJ., dissent.

COLLEEN CONWAY COONEY, J., of the Eighth Appellate District, sitting for COOK, J.

---

MOYER, C.J., dissenting.

{¶ 82} I concur in the judgment of the majority affirming appellant's conviction for aggravated murder. I would, however, reverse the death sentence and remand the cause for resentencing to a term of imprisonment for life, without the possibility of parole.

{¶ 83} In my view, the record does not demonstrate beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating circumstances so as to warrant imposition of the death sentence. In reaching this conclusion, I am persuaded by clear evidence in the record that appellant suffers from a severe mental illness. On the record before us, I cannot conclude beyond a reasonable doubt that Vrabel's mental illness did not causally contribute to his tragic criminal conduct, thereby reducing his moral culpability to a level inconsistent with the imposition of the ultimate penalty of death. I do not believe that appellant's crime falls within the category of the most heinous of murders for which the General Assembly has properly reserved the death penalty.

{¶ 84} The majority acknowledges that, notwithstanding the fact that Vrabel presented no mitigating evidence, R.C. 2929.05 mandates that we "review and independently weigh *all of the facts and other evidence disclosed in the record in the case* and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case." (Emphasis added.)

{¶ 85} I agree with the majority that the evidence proves beyond a reasonable doubt the aggravating circumstance in this case: that Vrabel murdered two people, his live-in companion and his daughter, as a course of conduct. R.C. 2929.04(A)(5). Vrabel purchased a pistol and, on that same day, inexplicably shot Susan Clemente in the head. He shot her again so she would not suffer further. He then fatally shot his daughter, concluding that she would be "better off" because her mother was dead and her father was going to jail. After wandering around the state for several days, Vrabel returned to his apartment, slept in a room with the deceased victims, and then placed their bodies in the apartment refrigerator and freezer. Vrabel continued to live in the apartment for several weeks under these conditions.

{¶ 86} These facts do prove the existence of the aggravating circumstance: Vrabel killed not one but two people. However, both the facts surrounding the murders and the bizarre reasoning employed by Vrabel in explaining them are certainly consistent with the conclusion that Vrabel suffered from a mental disease or defect at the time of his criminal course of conduct.

{¶ 87} It is true that appellant did not meet the criteria of the insanity defense. However, the criteria for that defense are not legally equivalent to those required for mitigation. The majority cites *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016, for the proposition that a defendant may be "psychotic and still be capable of understanding the charges against him and of assisting his counsel." That proposition does not, however, mean that the presence of psychotic illness at the time of a crime is not strongly mitigating.

{¶ 88} R.C. 2929.04(B)(3) identifies the following as a mitigating factor to be considered in determining whether the aggravating circumstance is sufficient to outweigh any factors in mitigation: "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Further, psychological and mental problems that do not match these criteria nevertheless may be considered mitigating pursuant to the "other factors" provision of R.C. 2929.04(B)(7). See *State v. Seiber* (1990), 56 Ohio St.3d 4, 9, 564 N.E.2d 408.

{¶ 89} Moreover, in my view, the nature and circumstances of the crime may be mitigating where the murder results from delusional or paranoid thinking caused by mental illness, although the weight of that mitigation will vary on a case-by-case basis.

{¶ 90} The majority acknowledges that appellant was diagnosed by a number of mental health professionals as suffering from the recognized brain disorder of paranoid schizophrenia or, alternatively, personality disorder with schizophrenic and/or paranoia features, both severe mental illnesses. In addition, defense counsel filed a motion to determine appellant's legal competence to stand trial on May 11, 1989, only one month after his arrest, and Vrabel was found incompetent to stand trial for the five years following the murders. During that time, he was institutionalized in a psychiatric hospital and subjected to forced medication. These facts constitute significant evidence indicating that Vrabel suffers from a mental disease or defect.

{¶ 91} The testimony at trial did conflict as to whether Vrabel lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Cf. R.C. 2929.04(B)(3). Dr. Darnall opined that Vrabel could not distinguish between right and wrong at the time of the offense. Dr. Giannini, a rebuttal witness for the state, noted that Dr. Darnall stated that his conclusions were valid only if Vrabel was telling the truth during Dr. Darnall's examination of Vrabel about hearing voices and experiencing hallucinations.

{¶ 92} While Vrabel "absolutely denied" having hallucinations when Dr. Giannini evaluated his sanity, Vrabel's denial of manifestations of his own mental illness does not negate the likelihood that he suffered such hallucinations. Dr. Nancy Huntsman, a forensic clinical psychologist whose evaluation of Vrabel had led the trial court to find him incompetent to stand trial, testified that Vrabel stated that he had experienced hallucinations. Vrabel told Huntsman in 1990 that "he had heard the voice of Susan and Lisa call to him."

{¶ 93} Dr. Darnall testified that Vrabel had told him he thought Susan and Lisa would rise from the dead "on Easter day." Vrabel told Dr. Darnall that he believed his deceased father's voice commanded him to "kill us or them." Prior

to trial, Vrabel filed a handwritten motion requesting a change of venue to the "spirit world" and to be "parachuted into an anti-American country handcuffed behind his back."

{¶ 94} The record demonstrates bizarre actions of Vrabel at the time of the crime; a long period of psychiatric hospitalization to restore him to competency for trial; agreement by a number of psychiatric professionals that he suffered mental illness; inconsistent but repeated demands by him to proceed pro se based on the belief that appointed counsel were part of a larger conspiracy against him; repeated bizarre outbursts and behaviors during the trial; his refusal to offer mitigating evidence at the penalty phase; his denial of the existence of mental illness or any other mitigating factor, thereby effectively inviting the jury to recommend a death sentence; and his request to trial counsel to stand silent at sentencing.

{¶ 95} None of these facts, standing alone, would convince me that appellant's mental health was impaired so as to outweigh the horrendous tragedy of the deaths of his two victims. However, in my view, the foregoing evidence viewed cumulatively establishes the presence of the R.C. 2929.04(B)(3) factor as well as the "other factors" contemplated by R.C. 2929.04(B)(7). The totality of these circumstances strongly militates against imposing the death sentence.

{¶ 96} This court has found in prior cases that the presence of the R.C. 2929.04(B)(3) factor necessitated the vacating of the death sentence where the defendant, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. See *State v. Lawrence* (1989), 44 Ohio St.3d 24, 32, 541 N.E.2d 451; *State v. Claytor* (1991), 61 Ohio St.3d 234, 244–246, 574 N.E.2d 472.

{¶ 97} Additional mitigating factors favorable to Vrabel are revealed in the record. He lacked a significant history of prior criminal convictions or delinquency adjudications. R.C. 2929.04(B)(5). See, also, *State v. Clemons* (1998), 82 Ohio St.3d 438, 456, 696 N.E.2d 1009. Given his mental defect, Vrabel's admitted intoxication at the time of the offense is also mitigating. See *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 145, 652 N.E.2d 710

{¶ 98} Upon independent weighing, I cannot subscribe to the majority's finding that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. I therefore dissent.

PFEIFER and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

---

LuWayne Annos, Special Counsel for the Mahoning County Prosecuting Attorney, for appellee.

John B. Juhasz and Mary Jane Stephens, for appellant.