[Cite as *State v. Kacmarik*, 2014-Ohio-2264.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 100177**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MICHAEL KACMARIK

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-566852

**BEFORE:** Rocco, J., S. Gallagher, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** May 29, 2014

-i-

**ATTORNEY FOR APPELLANT**

Patricia J. Smith
9442 State Route 43
Streetsboro, Ohio 44241

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:   Melissa Riley
Assistant Prosecuting Attorney
The Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

KENNETH A. ROCCO, J.:

{¶1} Defendant-appellant Michael Kacmarik appeals from his convictions after a jury found him guilty of felonious assault and vandalism, both with furthermore clauses.

{¶2} Kacmarik presents three assignments of error. He claims that: (1) his convictions are against the manifest weight of the evidence, (2) his defense attorneys rendered ineffective assistance by stipulating to an evaluation that he was competent to stand trial and by failing to request another evaluation, and (3) the trial court should have ordered another evaluation prior to sentencing him.

{¶3} After a thorough review of the record, this court cannot conclude that Kacmarik's convictions are against the manifest weight of the evidence. In addition, the record does not support his claim that his attorneys were ineffective with respect to his competency to stand trial. Finally, the trial court had neither a duty nor a reason to question Kacmarik's competency before the court imposed sentence. Consequently, Kacmarik's convictions are affirmed.

{¶4} Kacmarik's convictions stem from an incident that occurred on the afternoon of September 10, 2012. The state's witnesses provided the following testimony of the circumstances that surrounded the incident.

{¶5} On July 17, 2012, Kacmarik purchased a 1997 Dodge Caravan from Thomas McCutcheon. McCutcheon owned and operated a used car business located on Lorain

Road in Cleveland, Ohio. Although McCutcheon priced the vehicle at $2,000, because Kacmarik was an acquaintance and appeared to be in need of transportation, McCutcheon permitted Kacmarik to take the vehicle for $1,400 in cash along with Kacmarik's promise to pay the remaining $600 within three weeks. McCutcheon kept title to the vehicle in the interim.

{¶6} However, as the third week approached, Kacmarik brought the Caravan back to McCutcheon's business premises. Kacmarik requested that McCutcheon place the vehicle back on his lot for sale on consignment. McCutcheon agreed; he and Kacmarik executed a contract that provided McCutcheon would refund Kacmarik his down payment when the vehicle had been resold. McCutcheon intended to ask for the original price.

{¶7} In the next two months, McCutcheon made three attempts to sell the vehicle but, each time, the prospective buyer had been unable to obtain financing for the purchase. Thus, when Kacmarik appeared at McCutcheon's business on the afternoon of September, 10, 2012, seeking the money from the Caravan's sale, McCutcheon informed him that, as yet, none was forthcoming. McCutcheon also informed Kacmarik that several catalytic converters recently had been stolen from some of the vehicles on the lot, and the Caravan had been one of the affected vehicles. McCutcheon assured Kacmarik that the business would cover the replacement.

{¶8} Kacmarik was unhappy with this news. The two men engaged in an exchange that became loud enough to attract the attention of the owner of the tavern next door to McCutcheon's lot. McCutcheon invited Kacmarik into the trailer used as a

business office to discuss the matter. From what the tavern owner observed, McCutcheon was handling the situation.

{¶9} At approximately 4:30 p.m., McCutcheon's wife, Maureen, arrived at her husband's business; she was driving a friend's car because McCutcheon was in the process of repairing Maureen's car. She noticed Kacmarik approaching her car. He was "yelling" and appeared to be "angry." McCutcheon hurried over to his wife and told her to leave the lot. She obeyed.

{¶10} Maureen parked at a store across the street. She watched her husband and Kacmarik "walking back and forth" in the lot. Kacmarik entered the Caravan and started it. He gave the engine a lot of gas. Without the catalytic converter, the Caravan made a great deal of noise. Its volume caused several persons in the tavern, including the bartender, DiAnn Josso, to take notice and to come to the open doors to satisfy their curiosity about the reason for it.

{¶11} In the driver's seat of the Caravan, Kacmarik began shouting that the vehicle was "malfunctioning." McCutcheon called to Kacmarik to turn the vehicle off. Instead, Kacmarik put it into reverse, drove backward so that he nearly "took off" the tavern's front door, and then put the transmission into drive. When the Caravan went forward, it smashed into one of the used cars in McCutcheon's lot. The crash caused a passing driver on Lorain Road to stop to observe the goings-on.

{¶12} After crashing into the first car, Kacmarik reversed the Caravan and backed up. Then he "stomped on the brakes," so that "the van stopp[ed] on a dime." He

"angled" his vehicle "towards another car" in the lot, stopped to "rev the engine," then put his vehicle "in drive, and [went] after the next car." He repeated this process, "screaming" that he could not control the Caravan and that the brakes were "malfunctioning."

{¶13} From her observation, however, Josso believed that Kacmarik "was deliberately going in reverse, banging [into] a car," then "putting it in drive, going into another car." Both she and Maureen believed Kacmarik mainly appeared to be "going after" McCutcheon, because Kacmarik aimed the Caravan at any car McCutcheon stood "closest to." Josso described the incident as "a demolition derby." She called out to McCutcheon to "get out of the way."

{¶14} Several people, including McCutcheon and Kacmarik himself, telephoned the police as the incident unfolded. In all, 12 cars were damaged in McCutcheon's lot by the time Kacmarik stopped the Caravan and exited the driver's seat. The police arrived shortly thereafter. They arrested Kacmarik.

{¶15} Kacmarik subsequently was indicted on two counts. He was charged with felonious assault with a furthermore clause that he used a motor vehicle as a deadly weapon, and with vandalism with a furthermore clause that the value of the property damaged was between $7,500 and $150,000. Kacmarik pleaded not guilty to the charges and was assigned counsel.

{¶16} By November 2012, defense counsel made the trial court aware that Kacmarik had "medical issues." Kacmarik told the court that he suffered from high

blood pressure, thyroid disease, and severe back pain. The court requested of the county jail medical director that he examine Kacmarik to evaluate his ability "to stand trial physically." Following that examination, the doctor determined that Kacmarik's "vital signs [were] near normal" and that he merely required some pain medication.

{¶17} Kacmarik's case proceeded to a jury trial. After the state presented its case in chief, Kacmarik presented the testimony of three witnesses and testified in his own behalf.

{¶18} The jury ultimately found Kacmarik guilty on both counts as indicted. Prior to conducting the sentencing hearing, the trial court ordered the preparation of a presentence report and referred Kacmarik to the court psychiatric clinic for a "disposition" assessment.

{¶19} In the interim, Kacmarik filed numerous motions pro se; among others, he sought to "dismiss" his defense counsel and to represent himself. The trial court held another hearing to address the outstanding issues.

{¶20} In reading from the results of the first assessment, the court stated that the psychiatrist determined Kacmarik was suffering from "bipolar disorder not otherwise specified," but that this disorder "was not a factor in the crime." The court noted, however, that in light of Kacmarik's wish to proceed pro se, the court had decided that an additional referral of Kacmarik to the psychiatric clinic would be made to determine whether he was capable of doing so.

{¶21} When the court next convened, it noted that the second psychiatrist who examined Kacmarik determined that he was not capable of proceeding pro se. The court granted the state's motion for an independent evaluation of Kacmarik's competency to represent himself and assigned an additional attorney to Kacmarik's case.

{¶22} As the independent evaluation was being prepared, the original trial judge recused herself. The administrative judge took over Kacmarik's case. A new date for the competency hearing and sentencing was set.

{¶23} When Kacmarik's case was next called, Kacmarik informed the court that he had changed his mind about representing himself and would proceed with new counsel. The court nevertheless stated for the record that the third psychiatrist had determined Kacmarik was competent. Both the prosecutor and defense counsel stipulated to this finding. The trial court accepted the finding and declared that Kacmarik was "competent to proceed."

{¶24} The trial court sentenced Kacmarik to a prison term that totaled four years. Kacmarik appeals from his convictions with three assignments of error.

> I. The jury clearly lost its way in finding the appellant guilty against the manifest weight of the evidence when it found that the appellant attempted to hit the victim and the other cars with the vehicle when in fact the vehicle malfunctioned and was unable to be controlled.

> II. It was ineffective assistance of trial counsel to fail to request a competency evaluation where the appellant's behavior before and during

the trial evidenced competency issues; and failure to request that the verdict be set aside when the report found the appellant incompetent to stand trial or assist in his defense immediately following trial; it was ineffective assistance of secondary counsel to stipulate to the second competency evaluation and to appellant's competency where there was substantial evidence to conclude that the appellant was not competent, specifically a prior report determining him to be incompetent only one month prior to the second report finding him to be competent and failure to request a hearing on competence or a third evaluation.

III. It was an abuse of discretion for the sentencing judge to sentence the appellant without holding a hearing on his competency where there were two divergent reports regarding his competence and where the sentencing judge had no prior interaction with the appellant prior to the sentencing hearing.

**{¶25}** Kacmarik argues in his first assignment of error that his convictions should be reversed because his version of what took place on September 10, 2012, was based upon evidence that was more "credible and consistent" than the evidence presented by the state. This court does not agree.

**{¶26}** The manifest weight of the evidence standard of review requires this court to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d

380, 386, 678 N.E.2d 541 (1997). The use of the word "manifest" means that the jury's decision must be "plainly or obviously contrary" to all of the evidence. *State v. Masci*, 8th Dist. Cuyahoga No. 96851, 2012-Ohio-359, ¶ 17. This is a difficult burden for an appellant to meet; this court must remain mindful that the weight of the evidence and the credibility of the witnesses are matters primarily for the jury to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *State v. Bruno*, 8th Dist. Cuyahoga No. 84883, 2005-Ohio-1862.

{¶27} In this case, McCutcheon's description of the incident found corroboration in the testimony of Josso and a passing motorist. Both of these witnesses observed that Kacmarik seemed deliberately to be targeting McCutcheon and the used cars on his lot in driving the Caravan. Neither woman had a connection to McCutcheon that would bias her recollection. In addition, the police detective drove the Caravan immediately after the incident and "found nothing wrong with the gears" and nothing wrong with the operation of either the brake pedals or the brakes.

{¶28} Kacmarik's testimony, on the other hand, was confusing; his recollection of dates relevant to his ownership of the Caravan was contrary to his documentary evidence. Moreover, on cross-examination, he contradicted not only his own witnesses, but also his own direct testimony.

{¶29} Similarly, although one of Kacmarik's friends testified that his inspection of the Caravan led him to believe that it was in "very dangerous" condition, he admitted that, when Kacmarik asked for his opinion, he told Kacmarik only that, "if he was going to

drive it to make sure he kept an eye on the gauges." None of Kacmarik's evidence demonstrated that the Caravan was uncontrollable.

{¶30} Consequently, the manifest weight of the evidence supports Kacmarik's convictions. His first assignment of error is overruled.

{¶31} Kacmarik's second and third assignments of error present a similar issue; therefore, they will be addressed together.

{¶32} In his second assignment of error, Kacmarik asserts that both his original and his "secondary" defense attorneys provided ineffective assistance with respect to his competency. He argues that his behavior and medical problems during the proceedings should have prompted his original attorney to file a motion for a mistrial, and that his secondary attorney should have declined to stipulate to the independent psychiatric report. In his third assignment of error, Kacmarik further argues that the administrative judge who presided over his competency and sentencing hearing erred in accepting the determination made by the independent psychiatrist that he was competent. Neither his second nor his third assignment of error has merit.

{¶33} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation; the second is whether the appellant was prejudiced by counsel's deficient performance. *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶34} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. *Id.* This court cannot second-guess a decision that could be a matter of defense strategy. *Strickland.*

{¶35} A defendant is legally incompetent only if he is "incapable of understanding the nature and objective of the proceedings against [him] or of assisting in [his] defense[.]" R.C. 2945.37(G); *State v. Tibbetts*, 92 Ohio St.3d 146, 164, 749 N.E.2d 226 (2001). A defendant is presumed to be competent to stand trial unless proof by a preponderance of the evidence is presented otherwise. *State v. Berry*, 72 Ohio St.3d 354, 360, 650 N.E.2d 433 (1995).

{¶36} A defendant has the right to a hearing on the issue of competency only when "the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." *Id.* at 359, quoting *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Defense counsel cannot be faulted for failing to raise meritless issues. *State v. Taylor*, 78 Ohio St.3d 15, 31, 676 N.E.2d 82 (1997). Therefore, if defense counsel does not consider that his client demonstrates sufficient indicia of incompetence, he renders no

disservice by conceding the matter. *State v. Brown*, 8th Dist. Cuyahoga No. 95481, 2011-Ohio-2285, ¶ 26.

{¶37} Kacmarik contends that his competence should have been an issue before sentencing based on his interactions with the trial court, his counsel's awareness of his health issues, and his prior mental health history. A review of the record with a focus on Kacmarik's interactions with his attorneys and the court, however, fails to display "sufficient indicia of incompetence" that would either require his defense counsel to ask for a competency assessment or lead the court to inquire into the matter. *Id*. at ¶ 24.

{¶38} Kacmarik's deportment, questions, answers to questions, and demeanor were all entirely appropriate and coherent. When he requested of the court that he receive special attention for his various medical problems, the trial court expressed empathy and ensured that Kacmarik's concerns were addressed. Karmarik testified in his own behalf at trial, and was subject to a thorough cross-examination. *State v. Bock*, 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986). Thus, Kacmarik's original attorney had no basis to question his client's competency.

{¶39} It was only after the jury convicted him, when Kacmarik decided that he wanted to "dismiss" his first attorney and proceed with his defense pro se, that the matter of his competency *to represent himself* became a matter for the trial court to address. Kacmarik's first psychiatric assessment did not address this specific issue.

{¶40} The second assessment opined only that Kacmarik was not competent to proceed pro se with his defense after trial. By the time the independent psychiatric

assessment was completed, Kacmarik had changed his mind and decided that his secondary attorney could provide effective representation for sentencing purposes. Under these circumstances, secondary counsel had no reason to reject the independent assessment.

**{¶41}** With respect to the administrative judge's handling of the case, a trial court's decision whether to hold a competency hearing after the trial has taken place is a matter within the trial court's discretion. *State v. Rahman*, 23 Ohio St.3d 146, 156, 492 N.E.2d 401 (1986). At the outset of the competency and sentencing hearing, the judge reviewed the psychiatric report and asked the parties for their reaction. Both the defense attorney and the prosecutor stipulated to the psychiatrist's determination that Kacmarik was competent. Kacmarik simply wanted to proceed.

**{¶42}** In light of the fact that Kacmarik's bipolar disorder was obviously well managed by his prescription medication, the judge lacked any "indicia of incompetency" that would necessitate any further inquiry into Kacmarik's mental state. *State v. Peeples*, 7th Dist. Mahoning No. 10 MA 132, 2012-Ohio-1149, ¶ 24. The trial court did not abuse its discretion in this matter. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 33.

**{¶43}** Accordingly, Kacmarik's second and third assignments of error also are overruled.

**{¶44}** Convictions affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
KENNETH A. ROCCO, JUDGE

SEAN C. GALLAGHER, P.J., and
TIM McCORMACK, J., CONCUR