THE STATE OF OHIO, APPELLEE, v. BARTON, APPELLANT.

[Cite as *State v. Barton,* 108 Ohio St.3d 402, 2006-Ohio-1324.]

(No. 2003–2036—Submitted September 27, 2005—Decided April 5, 2006.)

O'DONNELL, J.

{¶ 1} Rocky Barton appeals from a judgment of the Warren County Common Pleas Court entered pursuant to a jury verdict finding him guilty of the aggravated murder with prior calculation and design of his 44–year–old wife, Kimbirli Barton, and of a firearm specification. Separately, the court found him guilty of the death-penalty specification for a prior attempted-murder conviction and accepted his guilty plea to the charge of having a weapon while under a disability. Barton also appeals from those convictions and from the sentence of capital punishment entered in accordance with the recommendation of the jury.[1]

---

1. On October 4, 2004, Barton filed a pro se motion "to withdraw any and all direct appeals filed on his behalf." Further, he filed a pro se motion to "waive all review of his conviction" on October 24,

{¶ 2} On appeal, Barton presents four propositions of law, alleging that the trial court failed to adhere to our dictate in *State v. Ashworth* (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231, regarding his waiver of the presentation of mitigating evidence during the penalty phase of his capital-murder trial; that the court erred in failing to order an evaluation of his competency after his waiver of mitigating evidence and his attempted suicide; that the court denied his right to counsel by precluding him from presenting an unsworn statement in a question-and-answer format; and finally, that the state improperly indicted him for having a weapon while under a disability. Upon review, we reject each proposition of law and therefore affirm his convictions. Further, upon reviewing and independently weighing all the facts and other evidence in the record and considering the offense and the offender, we have determined that the aggravating circumstance—his prior attempted-murder conviction—outweighs the mitigating factors in this case and that the sentence of death is appropriate. And after conducting a proportionality review of the death penalty in conformity with R.C. 2929.05, we affirm the judgment of the trial court regarding the imposition of sentence.

{¶ 3} Kimbirli and Rocky Barton had known each other for many years and married on June 23, 2001, during his incarceration for attempted murder in Kentucky. Following his release from prison in 2002, he lived in a Warren County farmhouse on Bellbrook Road owned by his father, Donald, with Kim and Jamie, her 17–year–old daughter from a prior marriage.

{¶ 4} Barton and Kimbirli generally had an amicable relationship and planned to renew their wedding vows in May or June 2003. Tiffany, Kim's 22–year-old daughter from a prior marriage, described Kim's relationship with Barton as "[s]ometimes good, sometimes bad, the highs were very high, the lows were really low." Julie, Kim's 27–year-old daughter from a prior relationship, also described Kim and Barton's relationship as "up and down. * * * [R]eally good [or] really bad."

{¶ 5} Tiffany described Barton as "[v]ery moody, possessive, * * * controlling[,] * * * just very manipulative." Julie also thought Barton could be, at times, "very jealous, very controlling, very manipulative, always accusing [Kim] of things, causing fights." Jamie agreed that Barton acted "controlling and possessive," although she felt close to him and described him as the only father figure that she could depend upon.

{¶ 6} On January 16, 2003, the morning of the murder, Barton awakened Jamie at 7:20 a.m. and told her to get her things together: "You're going to Tiff's house. The wedding's off. Your mom's a psycho bitch." Barton then drove Jamie to

2005, seeking to cease all review by this court and forgo "all federal habeas and future pending appeals." As we have decided the appeal, these pro se motions are moot.

Tiffany's home and told Tiffany that her mother "had gone off the deep end and that she was crazy and she was leaving him." Jamie described Barton as acting "[r]eally strange" and "aggravated."

{¶ 7} Around 7:30 that morning, Kim arrived at Lasik Plus, where she worked as a technical assistant. Karla Reiber and Molly Wolfer, her co-workers, recalled that Barton had called more than six times that morning. He insisted on being placed on hold while Kim tended to patients, often for as long as 10 or 15 minutes, until she became available. Reiber described Barton as "very angry," and Wolfer described him as "very agitated, very angry," and "very irate."

{¶ 8} After speaking with Barton on the phone around 10:30 a.m., Kim related to co-workers that she had heard shots fired. She told others that she had heard a "bang" over the phone. Police later recovered a spent shotgun shell in a bedroom at Barton's home, which supported her suspicion that Barton had fired a shotgun while talking with her on the telephone.

{¶ 9} Wolfer described Kim as crying, "very frantic," and "very scared" when she left work around 10:30 a.m. Before leaving, Kim called Tiffany and asked whether she and Jamie could live with her temporarily. Tiffany described her mother as hysterical, frantic, and scared and agreed to have her mother and sister move in with her.

{¶ 10} Barton also talked on the telephone with several others that day. Around 7:45 a.m., he left a message with his employer, saying that he would not be at work that day because of a family emergency. Around 10:45 a.m., he spoke with his supervisor, Carol Williamson, and informed her that Kim had been "acting strange" due to her medication and that Kim intended to leave him.

{¶ 11} Barton also called Randy Hacker, Julie's former husband, and complained about Kim and Julie. Barton seemed "edgy" and "irritated," according to Hacker, and left Hacker a message, saying, "[B]efore I go on to my demise, I should call you." In a later call, Barton informed Hacker that Kim intended to move out and that he would be going back to jail.

{¶ 12} Barton also spoke on the telephone several times that day with Glen Barker, an insurance agent. Barker has a background in counseling, and he offered to serve as a mediator between Barton and Kim. Barton visited Barker at his office around 9:30 a.m. and seemed calm and quiet, but Barton was anxious to speak with his father, who was in Florida. Barker called Kim at work on Barton's behalf, but Kim would not discuss the matter. Barker testified that Barton adamantly refused to allow Kim to collect her possessions from their house.

{¶ 13} Barton's father, Donald, talked with Barton and Kim from Florida that morning in an effort to defuse the situation. Donald told Barton not to worry

because anything that Kim might take from the farmhouse could be replaced, and he informed Kim that she could keep his car, which she currently drove. Larry Barton, Barton's uncle, also spoke with Barton several times by telephone on the day of the murder, and he offered assistance. Barton told Larry that he thought the police would be called, and he vowed that "he wouldn't go back to jail."

{¶ 14} Around 11:00 a.m., Kim arrived at Tiffany's home. Barton called 25 or 30 times; Jamie and Tiffany overheard Barton cursing and yelling on the telephone and described his voice as "scary." Jamie overheard him tell Kim, "I'm going to kill you, you f* * *ing bitch," causing Kim to become "really nervous and scared" while "crying and shaking."

{¶ 15} Around 3:00 p.m., Kim and Jamie made plans to return to their Bellbrook Road home to retrieve some clothing and personal effects. When Larry arrived at Tiffany's house, however, he strongly advised Kim not to go home. She agreed to stay away but gave Larry a list of things that she and Jamie wanted him to retrieve.

{¶ 16} Immediately after Larry left to retrieve the items, Barton called again and persuaded Kim and Jamie to come to Bellbrook Road to obtain their things. When Larry arrived at Bellbrook Road, Barton had locked the gate, something he rarely did. Larry asked Barton to open the gate, but Barton absolutely refused to allow him onto the property. He kept saying, "I've lost it." Barton stood near his own truck behind the locked gate while Larry's truck remained parked on the road.

{¶ 17} When Kim and Jamie arrived, however, Barton unlocked the gate and instructed Larry to lock it after they entered because he did not want "the police * * * coming in." Then Barton got in his truck, backed up "real fast" into the garage, and closed the garage door. Larry and Kim separately drove onto the property.

{¶ 18} As Kim got out of the car and turned to shut her door, Barton came out the side door of the garage with a shotgun. As he ran toward Kim, he yelled "You aren't going anywhere, you f* * *ing bitch," and he then fired the shotgun while four to six feet from her and struck her in her side. Feeling the impact, Kim fell, but moved toward her daughter, yelling, "Oh, Jamie, Oh Jamie." As Jamie reached for her mother, Barton shot her in the back from a distance of one to two feet. Kim fell to the ground, while Jamie screamed, "Mom, can you hear me? Can you hear me? Please stay with me, mommy, please stay with me." Barton then aimed the gun at Jamie's head and at Larry. Barton next walked to the side of Larry's truck and said, "I told you I was insane," dropped to his knees, and shot himself in the face. Barton then walked into the house.

{¶ 19} Jamie and Larry called 911. Emergency Medical Services ("EMS") personnel arrived and upon examining Kim found her ashen in color, not

breathing, and with fixed and dilated pupils and no pulse. Following an autopsy, Dr. Karen Powell, a forensic pathologist, determined that Kim had died from "shotgun wounds of the left shoulder and right back regions" that caused injuries to her lungs, heart, and liver.

{¶ 20} In response to the emergency call, police arrived and located Barton, alert and cooperative, inside the house. An EMS technician described him as suffering from a gunshot wound with non-life-threatening injuries to his chin, mouth, and nose.

{¶ 21} Upon investigation, police confiscated the murder weapon, a .410 pump-style shotgun, and four spent shotgun shells. Police also recovered six live shotgun shells from Barton at the hospital.

### Indictment and Trial Result

{¶ 22} The grand jury returned a two-count indictment against Barton, charging him in the first count with the aggravated murder of Kimbirli with prior calculation and design, a gun specification, and a death-penalty specification for his prior conviction for attempted murder. The second count charged unlawful possession of a firearm while under a disability from a prior conviction. Barton pleaded guilty to the weapon-under-disability charge, but elected a jury trial on the aggravated-murder charge. The death-penalty specification was separately tried to the court.

{¶ 23} The state's case-in-chief included the following witnesses: Jamie, Carol Williamson, Peggy Barton, and her husband, Larry Barton. Through cross-examination of these witnesses, defense counsel elicited mitigating evidence about Barton. Williamson, Barton's supervisor, knew the family socially and testified on cross-examination that Barton and Kim seemed like a happy, affectionate couple, very much in love. She also testified that she never thought that Barton would harm Kim.

{¶ 24} Kim's daughter, Jamie, testified on direct examination that she had witnessed Barton shoot her mother twice with a shotgun and had watched her die in her arms. She testified on cross-examination that she and Barton had been close and that he had served as her only reliable father figure by helping her secure a car and driver's license and by insisting that she obtain a good education.

{¶ 25} On direct examination, Barton's uncle, Larry, stated that he watched Barton shoot Kim twice with the shotgun. Nonetheless, during cross-examination Larry described Kim and Barton as "best friends" who got along well. According to Larry, Barton worked hard seven days a week. Also, Barton had bought Christmas presents for Larry's grandchildren, and Larry loved Barton as if he were his brother.

{¶ 26} Additionally, on cross-examination, Peggy Barton discussed Barton and Kim's good relationship and Barton's friendship with Larry.

{¶ 27} Other evidence presented by the state established that on April 9, 1991, Barton pleaded guilty to attempted murder in Madison County, Kentucky. He received a sentence of up to 15 years. In accordance with Barton's request, the state presented no further details of that conviction at trial.

{¶ 28} The jury convicted Barton of aggravated murder with prior calculation and design in addition to the firearm specification, and the trial court found Barton guilty of the death-penalty specification.

{¶ 29} At the start of the penalty phase of the trial, the following colloquy occurred between defense counsel, Barton, and the trial court:

{¶ 30} "MR. HOWARD [defense counsel]: * * * Since we're beginning to start the mitigation phase in this case, I want to put on the record that throughout the representation that Mr. Oda and I have undertaken on behalf of Mr. Barton, he has consistently, from day one, * * * insisted that we not call any family members on his behalf as witnesses in mitigation.

{¶ 31} "We have enlisted, with the court's approval, a neuropsychologist to examine Mr. Barton for the possibility of offering testimony or mitigation evidence in regard to this case. That was a Jeffrey Smalldon.

{¶ 32} "Dr. Smalldon came down from Columbus on two occasions, spent about five or six hours with Mr. Barton. Mr. Barton basically refused to cooperate with any testing or participate in any testing with Dr. Smalldon and has instructed us not to call Dr. Smalldon as a potential witness.

{¶ 33} "And we just wanted to put that on the record and have Mr. Barton acknowledge that for purposes of the record; is that true?

{¶ 34} "MR. BARTON: Yes.

{¶ 35} "THE COURT: Okay. Mr. Barton, that's a fair representation of what's transpired in your case, sir? That's a fair representation that Mr. Howard has just made for the record?

{¶ 36} "MR. BARTON: Yes."

{¶ 37} Penalty-phase evidence consisted of an unsworn statement made by Barton. The trial court denied Barton's pretrial motion to use a question-and-answer format to present his unsworn statement. Although denying the request, the trial court declared that Barton "would have every opportunity to review [the statement] with his counsel, reduce it to writing, and touch all points per the direction and advice of counsel." Nevertheless, Barton instead made only the following unsworn statement to the jury:

{¶ 38} "MR. BARTON: At this time my attorneys advised me to beg for my life. I can't do that. I strongly believe in the death penalty. And for the ruthless, cold-blooded act that I committed, if I was sitting over there, I'd hold out for the death penalty. * * * I've recently done 10 years in prison. Life in prison would be a burden to all the citizens of Ohio. It would be at their cost. I wouldn't have nothing to worry about. I'd get fed every day, have a roof over my head, free medical, you people pay for it, I'd have a stress-free life. That's not much of a punishment.

{¶ 39} "Punishment would be to wake up every day and have a date with death. That's the only punishment for this crime. That's all I've got to say."

{¶ 40} Following Barton's unsworn statement, Barton's counsel strongly urged the jury to impose a life sentence. Defense counsel highlighted the close relationships between Barton and several members of his family, asserted that Kim would not have married Barton if she had not seen some good in him, and argued that Kim had facilitated the offense by returning to her home on the day of her murder. Highlighting Barton's unsworn statement, Barton's counsel claimed that Barton wanted to die, and if the jury were to impose death, it would be giving Barton "what he wanted on January the sixteenth and what he wants today." Counsel concluded by arguing for a life sentence without the possibility of parole: "Death is not a stiff enough sentence for Rocky Barton because it completes the plan * * *."

{¶ 41} Following the court's instructions and deliberation, the jury recommended a sentence of death. The trial court sentenced Barton to death on the aggravated murder count together with consecutive terms of three years' and five years' imprisonment for the firearm specification and the weapons-under-disability offense.

{¶ 42} On appeal, Barton now presents four propositions of law for our consideration. Upon careful review, we have concluded they are not well taken, and therefore, we affirm the judgment of the court regarding the criminal convictions. Upon further review, independently weighing all the facts and other evidence in the record and considering the offense and the offender, we have determined that the aggravating circumstance—Barton's prior attempted-murder conviction—outweighs the mitigating factors in this case and that the sentence of death is appropriate. And after conducting proportionality review of the death penalty in conformity with R.C. 2929.05, we affirm the judgment of the trial court regarding the imposition of sentence.

### Presentation of Mitigating Evidence

{¶ 43} Based on our ruling in *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, Barton argues that the trial court should have inquired whether he had

knowingly and intelligently waived his right to present mitigating evidence before proceeding in the penalty phase.

{¶ 44} The state asserts that this case does not warrant an *Ashworth* inquiry because Barton did not waive presentation of all mitigating evidence. Therefore, the issue for our resolution concerns whether *Ashworth* applies to the facts of this case.

{¶ 45} Upon review, we have determined that *Ashworth* is distinguishable on its facts and therefore does not apply. Ashworth pleaded guilty to aggravated murder, together with two death-penalty specifications, merged at sentencing. The court convicted him of aggravated murder and a single death-penalty specification at the conclusion of the guilt phase of trial, and Ashworth waived presentation of all mitigating evidence during the penalty phase of trial. Id. at 61, 65, and 71, 706 N.E.2d 1231. There, we held, "In a capital case, when a defendant wishes to waive the presentation of· *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary." (Emphasis sic.) Id. at paragraph one of the syllabus.

{¶ 46} And in *State v. Monroe,* 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, defense counsel honored the defendant's request not to call his family members to testify on his behalf during the penalty phase of trial and insisted that defense counsel present only his unsworn statement and the testimony from one witness. Id. at ¶ 98. There, we held: "*Ashworth* has no applicability here because Monroe did not waive presentation of *all* mitigating evidence. Given our emphasis in *Ashworth* on the word 'all,' it is clear that we intended to require an inquiry of a defendant only in those situations where the defendant chooses to present no mitigating evidence whatsoever. Moreover, Monroe's claim that he essentially presented no mitigating evidence is not borne out by the record. Regardless of how Monroe characterizes it, he did in fact present mitigating evidence." (Emphasis sic.) Id. at ¶ 74–75.

{¶ 47} Although *Ashworth* mandates that the trial court protect the defendant's rights when the defendant waives all mitigating evidence, a capital defendant generally has the right to control the defense. *State v. Tyler* (1990), 50 Ohio St.3d 24, 28–29, 553 N.E.2d 576. A defendant is entitled to "great latitude" and may decide what mitigating evidence he wishes to present in the penalty phase. R.C. 2929.04(C); see, also, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 189, 15 OBR 311, 473 N.E.2d 264, citing *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973. Furthermore, this court has long recognized that "the jury is not restricted to considering mitigating evidence presented in the penalty phase. Rather, the jury is required to consider 'any evidence raised at trial that is relevant * * * to any factors in mitigation.'" *State v. Jordan,* 101

Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, at ¶ 80, quoting R.C. 2929.03(D)(1). Other capital defendants have chosen to present mitigating evidence only through an unsworn statement asking for the death penalty. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 113–114; *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 22.

{¶ 48} In this case, we reject Barton's contention that the facts and circumstances warranted an *Ashworth* inquiry, because Barton did not waive the presentation of *all* mitigating evidence. Only waiver of *all* mitigating evidence triggers the requirement for an *Ashworth* inquiry. *Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus.

{¶ 49} Here, during the guilt phase of trial, Barton, through counsel, cross-examined several prosecution witnesses—Barton's supervisor, his father, his uncle, his uncle's wife, and his stepdaughter—and elicited mitigating testimony on his behalf, in contrast with Ashworth, who pleaded guilty. Such factual information concerned Barton's love of his family—including Kim—and his hard-working and nonviolent nature. The testimony also described and characterized his relationships with Jamie and other family members.

{¶ 50} Further distinguishing this case from *Ashworth*, Barton presented an unsworn statement during the penalty phase of trial in which he told the jury that he "strongly believe[d]" in the death penalty, that if he were a juror, he would "hold out for the death penalty," and that death is "the only punishment for this crime." Barton also explained why he believed the jury should impose the death penalty. Barton's recognition that this aggravated murder deserved the death penalty reflected his personal acknowledgment of the gravity of his crime. In fact, defense counsel used his statement to strongly urge the jury to impose a life sentence rather than the death sentence that Barton wanted.

{¶ 51} Presentation of mitigating evidence during either the guilt phase or the penalty phase of a capital-murder trial relieves the trial court of the duty to conduct an *Ashworth* inquiry. *Ashworth* applies only where the record demonstrates a waiver of the presentation of all mitigating evidence in a capital-murder trial. And only a waiver of all mitigating evidence during the guilt phase and the penalty phase of trial triggers the trial court's duty to inquire as to whether the waiver is knowingly and voluntarily made.

{¶ 52} We conclude that the evidence of mitigation presented during the guilt phase of trial as contained in the record, together with Barton's unsworn statement during the penalty phase of trial and defense counsel's closing argument, rendered *Ashworth* inapplicable to this case because Barton did not waive the presentation of all mitigating evidence. Accordingly, this proposition of law is not well taken.

### Competency Evaluation

{¶ 53} Next, Barton asserts that the trial court erred in failing to sua sponte order an evaluation of his competency in light of his waiver of mitigation and attempted suicide nine months before trial.

{¶ 54} The state counters by arguing that Barton did not waive the presentation of mitigating evidence and did not demonstrate any indicia of incompetence so as to trigger the trial court's duty to sua sponte order an evaluation.

{¶ 55} We are asked to consider whether Barton's actions indicated such incompetence that the trial court should have ordered a competency evaluation.

{¶ 56} R.C. 2945.37(G) creates a rebuttable presumption that a defendant is competent to stand trial. "This presumption remains valid under R.C. 2945.37(G) unless 'after a hearing, the court finds by a preponderance of the evidence' that the defendant is not competent." *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 74, quoting R.C. 2945.37(G). The "decision as to whether to hold a competency hearing once trial has commenced is in the court's discretion." *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 492 N.E.2d 401.

{¶ 57} "The right to a hearing rises to the level of a constitutional guarantee when the record contains sufficient 'indicia of incompetency * * * ' " *State v. Thomas,* 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 37, quoting *State v. Were* (2002), 94 Ohio St.3d 173, 175, 761 N.E.2d 591. We have further held that the trial court has no duty to question the accused's competence when " 'nobody on the spot thought [the defendant's] behavior raised any question as to his competence' " and no evidence of "outrageous, irrational behavior during trial" or complaints about the accused's lack of cooperation in his defense exists. (Emphasis deleted and brackets sic.) *State v. Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 63, quoting *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298. We have noted that "[f]actual determinations are best left to those who see and hear what goes on in the courtroom." Id., 87 Ohio St.3d at 84, 717 N.E.2d 298.

{¶ 58} In prior capital cases, we recognized that "[a]n otherwise logical, competent defendant may choose to waive mitigation simply because he wishes to exercise the right to do so" and that a capital defendant's decision to forgo mitigation does not by itself call his competence into question. *State v. Jordan,* 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 64, 54; see, also, *Cowans,* 87 Ohio St.3d at 81, 717 N.E.2d 298, quoting *Tyler,* 50 Ohio St.3d at 29, 553 N.E.2d 576. In *State v. Monroe,* 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 80, we recognized that "[a] court is required to inquire into a capital defendant's competence *only if some reason other than* the decision to forgo presentation of mitigation evidence exists that calls into question the defendant's competence."

(Emphasis added.) As previously discussed, Barton did not waive the presentation of all mitigating evidence.

{¶ 59} Despite his attempted suicide nine months before trial, the record does not contain any specific facts suggesting that Barton lacked competency to stand trial. No evidence in the record indicates that Barton was ever treated or hospitalized for mental disorders or that his friends or family questioned his sanity. Nor did events during the trial indicate any lack of competence. Neither defense counsel nor a retained psychologist who interviewed Barton for several hours raised any issue regarding his competence, and they closely interacted with him and had every opportunity to observe his demeanor.

{¶ 60} Barton's decision to limit mitigating evidence and his prior suicide attempt do not constitute sufficient indicia to trigger the trial court's duty to sua sponte order evaluation of his competence. Accordingly, we reject this claim.

### *Unsworn Statement*

{¶ 61} Barton contends that the trial court denied his constitutional right to counsel by overruling the pretrial motion to use a question-and-answer format to present an unsworn statement. See *Ferguson v. Georgia* (1961), 365 U.S. 570, 596, 81 S.Ct. 756, 5 L.Ed.2d 783. In *Ferguson,* the United States Supreme Court held that the state, "consistently with the Fourteenth Amendment, could not * * * deny [the defendant] the right to have his counsel question him to elicit his [unsworn] statement." Id.

{¶ 62} The state maintains that Barton has misinterpreted decisions of this court and the United States Supreme Court and asserts that the trial court did not abuse its discretion in denying his motion to present mitigating evidence in this format.

{¶ 63} The issue for our resolution, then, concerns whether the trial court's decision regarding the format of Barton's unsworn statement deprived him of his constitutional right to counsel.

{¶ 64} In *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 103, we squarely addressed this issue and held: "[T]he trial court did not violate [the defendant's] constitutional rights by denying his request" to use a question-and-answer format in making an unsworn statement. While stating that the trial court has the discretion to allow counsel to ask questions in presenting an unsworn statement, we held that neither R.C. 2929.03(D)(1) nor the Constitution compels such a practice. Id. at ¶ 103, 110.

{¶ 65} Furthermore, *Ferguson* arose in the entirely different context of "the common-law rule [codified in Georgia] that a person charged with a criminal offense is incompetent to testify under oath in his own behalf at his trial." Id., 365 U.S. at 570, 81 S.Ct. 756, 5 L.Ed.2d 783. The defendant in *Ferguson* had a

constitutional right to the assistance of counsel to present his view of events in an unsworn statement because, pursuant to Georgia law, he could not testify at all under oath. Id. at 596, 81 S.Ct. 756, 5 L.Ed.2d 783.

{¶ 66} In contrast, Barton could have chosen to testify under oath with the assistance of counsel either at the guilt phase or the penalty phase of trial. Thus, *Ferguson* does not apply to this case. Additionally, we have declined to adopt a constitutional right to a question-and-answer format in other cases. See *Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 103.

{¶ 67} Although rejecting the merits of his position on legal grounds, we also note that Barton failed to preserve the issue for appellate review because he failed to renew his objection to the format of his unsworn statement at trial and neglected to proffer the evidence he wished to present in the question-and-answer format. See *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34; *State v. Murphy* (2001), 91 Ohio St.3d 516, 532, 747 N.E.2d 765; Evid.R. 103(A)(2); *State v. Mitts* (1998), 81 Ohio St.3d 223, 227, 690 N.E.2d 522; *State v. Gilmore* (1986), 28 Ohio St.3d 190, 191, 28 OBR 278, 503 N.E.2d 147.

{¶ 68} For the foregoing reasons, this proposition of law is overruled.

### Indictment for Weapons Under Disability

{¶ 69} In his final proposition, Barton contends that the grand jury did not properly indict him for the offense of having a weapon while under a disability pursuant to R.C. 2923.13(B) because Ohio's first- and second-degree felonies are not so identified in Kentucky. R.C. 2923.13(B) increases the offense level for committing this crime when the offender was released from prison within five years of the offense. Barton pleaded guilty to R.C. 2923.13(B). According to Barton, his guilty plea does not waive the issue because a jurisdictional defect such as this may be raised at any time.

{¶ 70} The state disputes the merits of his allegation and asserts that Barton's guilty plea precludes him from attacking the sufficiency of the indictment.

{¶ 71} The indictment charged that Barton violated R.C. 2923.13(A) because he (1) did "knowingly acquire, have, carry, or use" a firearm on January 16, 2003, in Warren County, Ohio, and (2) did so, having "been convicted of [a] felony offense of violence: to wit: Attempted Murder" in Kentucky in June 1991. The indictment also charged the more serious offense of violating R.C. 2923.13(B)— namely, that Barton had the firearm "within five years of the date of [his] release from imprisonment" for attempted murder.

{¶ 72} Contrary to Barton's claims, the indictment correctly referred to both R.C. 2923.13(A) and 2923.13(B) because division (A) sets forth the basic offense, and division (B) adds elements of a more serious offense. See R.C. 2923.13(B) and 2923.13(C).

{¶ 73} Having rejected the merits of this argument, we also agree with the state that Barton waived any deficiency in the indictment by failing to object to the indictment and by pleading guilty to the offense. Crim.R. 12(C)(2) mandates that "Defenses and objections based on defects in the indictment" must generally be raised "[p]rior to" trial, and we have previously held that "failure to timely object to the allegedly defective indictment constitutes a waiver of the issues involved." *State v. Biros* (1997), 78 Ohio St.3d 426, 436, 678 N.E.2d 891, citing *State v. Joseph* (1995), 73 Ohio St.3d 450, 455, 653 N.E.2d 285. Crim.R. 11(B)(1) states, "The plea of guilty is a complete admission of the defendant's guilt."

{¶ 74} Based on the foregoing analysis, the language of the statute, Barton's failure to timely object to the indictment, and his plea of guilty, this proposition is not well taken.

### Independent Sentence Evaluation

{¶ 75} Pursuant to R.C. 2929.04(A)(5), the penalty for a conviction of aggravated murder can include death when the evidence reveals a previous conviction "of an offense an essential element of which was the purposeful killing of or attempt to kill another." The record demonstrates Barton's prior conviction for attempted murder in Kentucky beyond a reasonable doubt.

{¶ 76} Regarding mitigation, the nature and circumstances of the instant offense reveal no mitigating features. Evidence demonstrates that Barton planned to kill Kim on the day of the murder. After Barton repeatedly telephoned her that day, Kim and her 17–year–old daughter, Jamie, returned to Barton's home to retrieve their personal belongings. Upon their arrival, Barton told Larry to close the gate behind Kim's car to prevent the police from coming onto the property, and he thereafter immediately backed his truck into the garage, retrieved a shotgun, ran toward Kim, and shot her twice, with the fatal shotgun blast discharged into her back while he was less than two feet from her body. Kim died there in the arms of her daughter, Jamie. The nature and circumstances of this offense reveal no mitigating features.

{¶ 77} Further, although Barton chose not to present any mitigating evidence during the penalty phase of trial, he did make an unsworn statement to the jury in which he recognized the gravity of his conduct. Beyond that, we know about his history, character, and background from defense counsel's cross-examination of the state's witnesses during the state's case-in-chief. Larry, Donald, Jamie, and Barton's uncle, father, and stepdaughter testified that they loved and cared for him. The love and support of his family carry mitigating weight. See *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 199. The record also reflects that at the time of the offense, Barton had had gainful employment for about a year and worked hard at his job. We therefore accord

some mitigating weight to his employment. Cf. *State v. Fox* (1994), 69 Ohio St.3d 183, 194, 631 N.E.2d 124.

{¶ 78} The record does not contain evidence to support the statutory mitigating factors in R.C. 2929.04(B)(1) through (B)(6). For example, Kim did not induce or facilitate the offense, R.C. 2929.04(B)(1), by returning to her residence to retrieve her clothing, although Barton argued at trial that by doing so, she facilitated her own murder. Nor did Barton act under "duress, coercion, or strong provocation," R.C. 2929.04(B)(2). No evidence at trial established that Barton suffered from an R.C. 2929.04(B)(3) "mental disease or defect." Barton, age 46 at the time of the offense, cannot assert that the offense occurred as result of his youth. See R.C. 2929.04(B)(4). Barton has a criminal record, which renders R.C. 2929.04(B)(5) inapplicable. And he cannot claim accomplice status under R.C. 2929.04(B)(6).

{¶ 79} As to "other factors," R.C. 2929.04(B)(7), Barton accepted responsibility in his unsworn statement for what he had done. In that statement, he acknowledged that he had committed a "ruthless, cold-blooded act" that warranted the death penalty and noted that if he were on the jury, he would hold out for the death penalty. Thus, Barton did not attempt to minimize his conduct or blame others, but acknowledged the severity of what he had done. We recognize that he offered his unsworn statement in mitigation. Cf. *State v. Ashworth*, 85 Ohio St.3d 56, 72, 706 N.E.2d 1231 ("willingness to step forward and take responsibility for his actions, without any offer of leniency by the state, indicates a person who is remorseful for the crimes he has committed"). Remorse is a mitigating factor. *State v. O'Neal* (2000), 87 Ohio St.3d·402, 420–421, 721 N.E.2d 73; *State v. Mitts* (1998), 81 Ohio St.3d 223, 236, 690 N.E.2d 522. In accepting responsibility for his conduct, Barton indicated his remorse to the jury.

{¶ 80} Other than his unsworn statement and the evidence elicited from the cross-examination of his family members during the guilt phase of trial, no evidence of any other mitigating factors exists in the record of this case.

{¶ 81} In accordance with our duty pursuant to R.C. 2929.05(A) to "review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate," we have concluded that the aggravating circumstance of Barton's aggravated murder of Kim with prior calculation and design, together with his prior conviction for attempted murder, outweighs the mitigating factors in this case. We have further concluded that the sentence of death is appropriate.

{¶ 82} We are further required by R.C. 2929.05(A) to consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases.

Upon review, we have concluded that the death penalty is not disproportionate in this case when compared with other convictions for aggravated murder involving a previous conviction for attempted murder or purposeful killing. See, e.g., *State v. Taylor* (1997), 78 Ohio St.3d 15, 676 N.E.2d 82; *State v. Davis* (1992), 63 Ohio St.3d 44, 584 N.E.2d 1192.

{¶ 83} Accordingly, we affirm the judgment of the common pleas court.

Judgment affirmed.

LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

RESNICK, J., concurs in judgment only.

MOYER, C.J., concurs in part and dissents in part.

PFEIFER, J., dissents.

---

**MOYER, C.J., concurring in part and dissenting in part.**

{¶ 84} I write separately because I believe the majority misapplies our precedent and because a competency hearing should be required any time a capital defendant waives his or her right to present mitigation during the penalty phase.

{¶ 85} In *State v. Ashworth* (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231, we held, "[W]hen a defendant wished to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary." (Emphasis sic.) Id. at paragraph one of the syllabus. Although this court stopped short of requiring a competency hearing in every case in which a defendant chooses to waive mitigation evidence, we did hold, "A trial court should be cognizant of actions on the part of the defendant that would call into question the defendant's competence." Id. at 62, 706 N.E.2d 1231.

{¶ 86} Barton told the jury that if given the opportunity, he would vote to impose the death penalty and that the death sentence is "the only punishment for this crime." It is difficult to imagine more compelling indicia of incompetence. Yet through inverse logic, the majority holds that by stating to the jurors his feelings on the death penalty and its appropriateness for the crime that he, Barton, committed, he actually did present mitigating evidence. I cannot support this proposition.

{¶ 87} The majority cites three cases suggesting that they are analogous and that this court's disposition of Barton's argument is in line with precedent.

{¶ 88} In the first case relied upon by the majority, we specifically held that an *Ashworth* hearing was not required because defendant "Monroe did not waive

presentation of mitigating evidence. Monroe called a former neighbor to testify in his behalf * * *." *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 98. The addition of witness testimony to his unsworn statement removes *Monroe* from the *Ashworth* requirements. We have never held that a defendant must present all possible mitigation evidence. Here, though, Barton's sole evidence was his statement requesting the death penalty. There is no other "mitigating" evidence. The facts of Barton are clearly distinguishable from *Monroe*.

{¶ 89} The majority cites two other cases in which this court has allowed capital defendants to limit mitigating evidence to an unsworn statement. Yet in both cases, the trial court judge first conducted an in-depth hearing to determine that the defendant was competent to waive mitigation. In *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, the defendant argued that his waiver was entitled to greater scrutiny because he had actively sought the death penalty. Id. at ¶ 56. In rejecting that argument and affirming his death sentence, we noted that "prior to the penalty phase, the three-judge panel thoroughly questioned Mink before finding that he was competent to waive the presentation of mitigating evidence." Id. at ¶ 60. Later, in rejecting his claim that his plea was not voluntarily and knowingly made, we observed, "Before finding that Mink was competent to waive mitigation and allowing him to waive the presentation of mitigating evidence, the trial court fully questioned Mink about mitigation during the *Ashworth* hearing." Id. at ¶ 83.

{¶ 90} Similarly, in *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 36, upon a jury verdict of guilty on all counts, the defendant filed a motion requesting that no mitigating evidence be presented other than his own statement. "The court then ordered [the defendant] examined by psychiatrist Dr. Robert Algaier to determine whether he was competent to waive presentation of mitigation evidence. * * * Dr. Algaier found him capable of 'waiving mitigation with full understanding of possible outcome and implications.' Prior to the mitigation hearing, the trial court tried several times to persuade appellant to change his mind; he declared, 'I don't wish my attorneys to say anything.' Subsequently, appellant presented only a short unsworn statement at the mitigation hearing." Id. at ¶ 36–37.

{¶ 91} In both of these cases, this court approved the death sentence after determining that the trial court judge had properly conducted a competency hearing.

{¶ 92} As I stated in my concurrence in *Ashworth*, "A court must determine that the defendant has the mental capacity to understand the choice between life and death, to make a knowing and intelligent decision not to pursue the presentation of evidence, and to fully comprehend the ramifications of that

decision, and possess the ability to reason logically." Id., 85 Ohio St.3d at 74, 706 N.E.2d 1231 (Moyer, C.J., concurring).

{¶ 93} I do not know whether Barton was competent to waive the presentation of mitigation evidence during the penalty phase of the trial. I do not know whether he understood the ramifications of his statements to the jury suggesting that he deserved the death penalty. On the record before us, no one can be certain of Barton's competence when he urged the jury to sentence him to death. At a minimum, the trial court should have followed our precedent and conducted a colloquy with Barton to determine whether he was competent, whether he knowingly and voluntarily waived his right to present evidence, and whether he understood the ramifications of his actions. To enable the trial court to make an adequate competency determination and to preserve the record for this court to review, the trial court should conduct a competency evaluation any time a capital defendant wishes to waive the presentation of all mitigation evidence or requests imposition of the death penalty. Such a rule would greatly diminish the appellate review of an issue that should be resolved with certainty at trial.

{¶ 94} For the foregoing reasons, Barton's death sentence should be reversed and the cause remanded to the trial court for a competency hearing to determine whether Barton is indeed competent to waive mitigation evidence.

PFEIFER, J., concurs in the foregoing opinion.

---

PFEIFER, J., dissenting.

{¶ 95} The majority so distinguishes State v. Ashworth (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231, as to render it meaningless. Its opinion essentially says that any testimony that could possibly be construed as mitigating, even if given during the guilt phase, will be construed as if it had been offered in mitigation by the defendant. The syllabus law declares that any testimony that reflects positively on the defendant—even a single, stray statement not elicited by counsel—could be sufficient to deny that defendant an Ashworth hearing. This standard is so restrictive that it ought not to be countenanced. Indeed, Ashworth would not pass this new standard because Ashworth expressed remorse. Id. at 61, 706 N.E.2d 1231.

{¶ 96} In an unsworn statement, Barton told the jury that death is "the only punishment for this crime." Our country's most creative writers of fiction would be hard-pressed to spin Barton's statement as evidence offered in mitigation. Yet a majority of this court unquestioningly accepts that it was. The majority's conclusion is in sharp contrast to its analysis in State v. Vrabel, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 77, in which this court stated that Vrabel

"presented no mitigating evidence," even though he had offered his unsworn statement.

{¶ 97} Finally, I do not believe that the facts of this case justify imposing a sentence of death. The murder that Barton committed was heinous, and his guilt is undeniable, but Barton's crime is not deathworthy. See Crocker, Concepts of Culpability and Deathworthiness: Differentiating Between Guilt and Punishment in Death Penalty Cases (1997), 66 Fordham L.Rev. 21. This case involves a hot-blooded domestic killing. Absent evidence that Barton's previous attempted murder occurred in similar circumstances—evidence not present here—upon independent weighing, I do not believe that the death penalty is appropriate. I dissent.

---

Rachel Hutzel, Warren County Prosecuting Attorney, Andrew L. Sievers, and Derek B. Faulkner, Assistant Prosecuting Attorneys, for appellee.

Christopher J. Pagan and Chris McEvilley, for appellant.